The first case is United States v. Mangano and we are ready to proceed. May it please the court, my name is Bradley Simon. I am here on behalf of Linda Mangano. Your honors, I would submit to you that the convictions of Ms. Mangano on both the obstruction counts and the false statement count should be reversed as a matter of law. With respect to the obstruction, there is nothing in the record to prove, and the government has not proven, that Ms. Mangano knew that whatever statements she made to government agents, which are alleged to have been false, were going to make its way to the grand jury. She received a grand jury subpoena for testimony. She did. And then her lawyer arranged for her to be interviewed by the assistant U.S. attorneys instead. Right. That is a very conventional, well-known procedure for substituting that kind of interview for grand jury testimony. It has the advantage for the witness that she can have her lawyer seated next to her, which can't happen in the grand jury. Well, but she was never told that she was not going to appear. What is the evidence that she was never told what? That she would not have to appear before the grand jury. She received a grand jury subpoena, so she believed she was going to testify before the grand jury. But you say she believed that. She didn't testify in the trial. No, but there's no evidence in the record to show that she knew that whatever information she gave those government agents would make its way to the grand jury. Is that not something that can be reasonably inferred from the use of this standard procedure in criminal investigations? I respectfully disagree, Your Honor, because if you look at the case of the United States v. Schwartz, he also received a grand jury subpoena. He received a grand jury subpoena, there was no subpoena for testimony from him. And I would argue to you that that's an even more compelling reason, because if she received a grand jury subpoena for her testimony, there was no reason for her to believe that some summary notes that she gave to government agents at an interview would make its way to the grand jury when she was fully expecting to testify herself and allow the grand jury to hear her own words directly. Is there any evidence that she ever requested to appear before the grand jury? Well, it's not a question of her requesting, she was summoned to appear before the grand jury. Okay, all right, I hear you. Yes, so we would that this situation is directly on point. Did you represent her at the time? I did not, I'm only representing her on appeal. I see. I would submit that this case and the facts fall squarely within the parameters set forth in the United States v. Aguilar by the U.S. Supreme Court and this court as well in U.S. v. Schwartz. If you look at the facts in Schwartz, they're almost identical to what occurred here. You know, Aguilar makes it very clear that it's not sufficient to convict for obstruction or impeding a grand jury proceeding if a defendant makes statements to government agents that may or may not find their way to the grand jury, and that's exactly what happened here. The government had to prove that the agent, in this case Agent Spence, was serving as an arm of the grand jury. There's no evidence in the record to support that. So I think... Was Agent Spence not the person who served the grand jury subpoena as an agent of the grand jury? I don't know who served the, which specific agent served the subpoena, but I submit that under this court's decision, U.S. v. Schwartz, it makes no difference, because in both Aguilar and Schwartz, in Aguilar, the defendant suspected that there was a grand jury proceeding, and I think he asked the agents if there was one, and they replied yes, and in Schwartz, he was fully aware that there was a grand jury proceeding. He received a subpoena, and so in both cases, the court said it makes no difference if he thought that there was a grand jury subpoena and that the statements may or may not make it to the grand jury. The record has to reflect that the defendant knew, without a doubt, that the testimony she was going to give to government agents in a proceeding, an ancillary proceeding, not the grand jury, would somehow make it to the grand jury, and I think Aguilar and Schwartz are binding here. Both cases make it very clear that there is a substantial nexus, and that nexus has not been, has not been, was not proven, so. To the extent that this is an argument about the jury instruction, the government says that you, your client, didn't request the language about ancillary proceeding from Aguilar. Well, I submit that the letter that was submitted by the co-defendant was sufficient. If the court feels otherwise, I would submit that even under the plain error standard, the record fails to support. There's clear error because there's no evidence in the record that she knew that whatever testimony she was going to give in the interviews with government agents would somehow make it to the grand jury. So even under a clear error standard, I think we would, there are sufficient evidence. So, and the other grounds for reversal is, is the conviction for false statements. I think, I think it's clear that there was no basis for the jury to find that Ms. Mangano made false statements to government agents because there was nothing put before the jury to show what exactly she said. All they had was a summary of notes taken by the agent, I think, I believe a few days after the proceeding, and there was simply a summary. So exact words of what Ms. Mangano said were never put before the grand jury. So you're suggesting that, in effect, there can never be a prosecution for false testimony to government agents in the absence of a transcript, verbatim transcript, or a recording of the conversation in which those statements were made? No, Judge Moshe, I'm not saying that. I think it's... Why would not anyone in a situation where there was an oral interview be able to make exactly the argument that you're making? No. Well, first of all, let me respond in two points. I think it's preferable that a transcription be made, and especially here, they had the ability to do so. There was an audio, there was audio equipment right in the room. You're aware, of course, that there are many, many, many cases in which convictions of this sort have been affirmed. Yes, but let me, let me... Anyway, I'm sorry for interrupting because you had a second point which might be actually responsive to what I asked, which is, what is it that would distinguish any case in which there was not a transcript or a recording of the interview in which a false statement prosecution for all statements would be permissible? Yes, Judge Moshe, I was about to answer that. In the absence of recording or transcription, if the jury had before them notes which recorded the exact quotes as to what Ms. Mangano said... Purported to be exact quotes. Yes. If they had, if the jury was given the exact questions and the exact answers, even if they were, came from notes, that would be okay. But here, and as, as the Supreme Court has said in U.S. v. Bronston, the governor has to prove that the statements uttered were literally false. And, and here we don't know that because we, the jury was never provided with the exact statements. Ms. Spence testified that after the fact, she, she sort of reconstructed what was said a few days later. And she said she had before her the answers and she reconstructed the questions. However, if, as in Bronston, Ms. Mangano had uttered a, had given a literally true, even if misleading statement, the misleading statement would not have enabled Ms., the agent to have reconstructed the question because the answer was misleading. So under, under Bronstein, because we don't know what she said and, and there was no opportunity to even demonstrate that, as in Bronstein, the questions might have, answers might have been misleading. I'm sorry. For example, one of the false statements was that Ms. Mangano in April 2014 told Singh she was leaving his employment. Isn't that either true or it's not? She either told Singh that or she did not tell Singh that? I mean, what is, what is the possible ambiguity about that reported statement that would make it literally true but deceptive? I don't know about that one, but we don't know. That's one of the things, the statements on which she was convicted. So I'm trying to test the theories that there is some reasonable doubt as to whether that statement could be literally true in response to some sort of question. She either said that or she did not say that, right? Correct. But, but we don't have the full line of questioning that was asked of her. Give me a theory as to wherein that statement is not a simple statement of fact that is either true or false. That one, but what about other statements? Focus, there's only, that's one count of conviction. That is, that is a specific conviction that you are challenging and you are telling me that this is legally insufficient because that statement might have been worded in some way that would make it literally true but misleading. And I'm trying to understand what that could possibly be. Well, but we don't know if that was actually what Ms. Mangano said. Well, you see, that's exactly the problem, isn't it? If, if there is going to ever, you know, and it's a, it's a point you can argue that all of the cases that have been decided in which convictions of this sort have been affirmed are wrong, that's fine. You said that that's better on policy grounds. I'm not sure how that links to anything in the statute, but okay, you can argue that, but you're telling me that, in effect, there could not be proof beyond a reasonable doubt that the statement, that the statement was false. Now you revert to, well, we don't know what was actually said, but that would be true if Agent Spence had put quotation marks around it. Also, you're just relying on the agent's word either way, that this is what she said. No, I'm saying, but we don't know the context in which that question was asked, so. If you could give me any hypothetical context that would render this statement literally true, albeit misleading, in light of the evidence that was before the jury, I'd be interested to hear it. You're saying that her statement that she was leaving the employment? That she told Mr. Singh in April 2014 that she was leaving his employment, yes. I mean, maybe, maybe she did. I mean, that's the, that's the question that was before the jury, is was this true or false? But you're telling me there's a third possibility, that the statement was literally true, but misleading in some kind of context, and I was wondering what that context was. Well, I don't know, but it was not the only question that was, that was asked to her. Well, we can go through all six. I just picked one. Okay. But okay, so I guess I have your answer. Okay. So I, and I reiterate that under, under Bronstein, Bronstein, U.S. v. Bronstein, you, you have, they can only convict if there, if there was, if the government proved that the questions were literally false, and, and, and Ms., Ms. Mangano was denied the opportunity to argue that her statements were literally true, because we really don't know what exactly she said. I, I understand, Your Honor, you know, that there were some specific questions, and answers, and, and specific answers, and, and, and surmised questions based on the answers that, that the agent provided, but I, I submit. Well, you say she was denied the opportunity to argue this to the jury, that she, she had the opportunity to argue to the jury that the government had not proven its case beyond a reasonable doubt. Right, right, but. And was there, was there no argument that, was there no argument of precisely this sort? That look, you don't even know what she actually said. Right, and, and I, I submit that, that it wasn't even a question for the jury, because without knowing exactly what her statements were, just like in Bronstein, where the agent, where the defendant gave a very misleading answer, but it was literally true. That is the standard which the Supreme Court has set. You have to, the, the, the jury has to. Well, that's what the that was an issue, right? That's the, yes. And we have extended that proposition to false statement prosecutions involving oral statements in which we affirmed the convictions. Right, but, but I think the analogy is. Without a transcript or a. Yes, and if in that case where there was a transcript, and the, and the Supreme Court felt it was insufficient, here we don't have a transcript, and, and, and Agent Lynch testified, I'm sorry, Agent Spence testified that when, when putting together these summaries, there is a, there is quite a bit of guesswork and speculation involved, and, and so we're, we're left with some summaries, and that's all they were, summaries of, of what Ms. Mangano said. Your argument is that in the absence of an agent doing the best they could inscribe to write the exact questions and exact answers, it is just impossible to prove a case of false statements beyond a reasonable doubt, because there is the possibility that the statement was literally true. Correct, and I'm not, I, I would advocate that when, that these statements, because it's so critically important to a defendant, that if they're, if a defendant's going to be charged with making false statements, the government has the ability to transcribe them and record them, and they should do so, because if this court says it's okay not to, then they're never going to do it, and I think it's unfair to a defendant like Ms. Mangano, but if they're not going to record, there ought to be exact statements and questions and answers and quotes, and she, the, the agent testified that she didn't even know what the questions were, she was surmising, and, and to me, to convict somebody for false statements with that scenario is, is, cannot, cannot pass muster, and I, I believe I have three minutes reserved. Thank you. May it please the court, Fred Riley Jr. for defendant Edward Mangano. We raised several issues in our briefs, but we'd like to focus our argument this morning on the sufficiency challenges to the honest services fraud obstruction and bribery counts. I plan to discuss the honest services and bribery counts, and my friend Mr. Fodeman will discuss the obstruction counts. The fundamental problem running through the government's theory of honest services fraud and bribery here is that Mr. Mangano didn't work for the government that the prosecution claims was defrauded and took corrupt action. He was the executive of Nassau County and held no office and no position in the town of Oyster Bay. Are there questions about Oyster Bay within Nassau County? There are, your honor, but whether you view that issue through the lens of a fiduciary duty, the fiduciary duty element, or through the lens of official action, as that term has been inverted, that's not enough. So if you think of it in terms of the fiduciary duty, the fiduciary duty runs through a principle, and in this context, it has to run to a particular government, and Mr. Mangano... Wait, government? A particular government. What about a particular group of constituents? Your honor, it runs through the government to the constituents. Yes. In this particular context, much the same way, I would say... You don't think the governor of New York has a fiduciary duty to the citizens of the city of New York? Your honor, those are distinct fiduciary relationships. So a particular citizen can hold different and distinct fiduciary relationships with their representatives. So for example, somebody who's living in New York, if they are served by the mayor of New York, they are served by the governor of New York, they are served by their federal representatives and the president of the United States, but those are distinct fiduciary relationships. I think if you consider the conflicts that... So if the governor leans on the mayor to take a particular action that would be to the detriment of the citizens of the city of New York, but to the financial benefit of the governor, nothing bad has happened, nothing in violation of the honest services fraud statute has happened. Not that here's why. Back in Skilling, the Supreme Court held that you have to have a specific quid pro quo, or you have to have a kickback scheme. The honest services fraud statute is not so broad that you can just say that an official has engaged in self-dealing. I'm talking about a very specific kind of bribe, right? I mean, Mr. Mangano, there's overwhelming evidence, was given a bribe of a year, for several years, from Mr. Singh. So he's getting what any citizen would think is a bribe, and the question is, is there a quid for the quo, right? Yes, your honor, but judgements, that gets us to McDonnell. It's McDonnell in construing what a quid pro quo is, focused on two requirements. The first is that there has to be an official exercise of governmental power. There's got to be a subject or matter that the government is taking action in, that's the quo. But there's a second requirement, and that is that the official take action on that question or matter. And therein lies the problem here, because Mr. Mangano could not have taken action in the sense that matters for McDonnell and Birdsaw in the town of Oyster Bay. So your argument, to make it pretty simple, I think, is that Mr. Mangano, when he interacts with the town supervisor of the town of Oyster Bay, is acting more or less like Margiotto, as a sort of party boss, as someone who has unofficial influence, not someone who has official power to make life uncomfortable for the supervisor and the people of Oyster Bay. That's exactly right, and that's why the verdict here can't be squared with McDonnell, because McDonnell, when it's talking about indirect official action, whether it's a superior or a subordinate, the point is that by virtue of the person's office, they have the authority to give advice, they have authority to influence, and the second officer or the second official, that person has a duty to consider that advice or to carry out that direction. They have a shared command structure, they have shared fiduciary duties, and that's why the action, the indirect action that the first person takes, whether they give advice or they give pressure, carries the formal force of official power, and that is completely lacking here. I would note that Governor of New York deals with Mr. Adams. You don't think that she acts with the background of the official power to do lots of things that Mayor Adams has to worry about her doing or not doing? Judge Lynch, I think that there has to be a distinction between formal authority and formal duties and even indirect or influence that can flow from, say, the importance of the office. I think Birdsall speaks to this. Birdsall, when it talks about official power, says, and I'm quoting here, in determining the scope of official action, regard must be had to the authority conferred, and Birdsall also talks about duties. So you define official action when you're talking about a particular official in terms of their authority and in terms of their duty, and that's lacking here. And the government, this is important, the government, in arguing why there was official action here, focused on Mr. Mangano's political plot. So it's just the kind of informal influence and political influence that the Supreme Court has expressed caution about in recent cases, including Percoco. This is what the government said in closing, and I'll just quote a couple of the statements. If Ed Mangano is taking official action using his political clout, political clout because he is getting bribes from horrendous things, he's guilty, he's guilty. The government goes on. Ed Mangano is using his political clout, his political influence over John Venditto. That is exactly the kind of influence that the court in Percoco... Percoco is not serving in any public office at all, and the analogy of the relationship between the governor and the mayor of New York seems very apt. It's hard to conceive that your client wasn't acting in his official capacity, if he didn't have that, if he didn't hold his office, that the same meeting could have taken place and the same influence could have been exerted. But the gap between Nassau County and Mr. Mangano's office in that county and the alleged action, the challenged action here, which is the concession amendment approval in this other government, in this town of Oyster Bay, the way the government bridged that is with political clout, and that's just what the Supreme Court said in Percoco is insufficient to give rise to an honest services crime. I'm confused because I think political clout can mean different things, right? Yes, sir. Partisan political clout or it can mean actual governmental political clout. I'm surprised that you're invoking McDonnell for your sufficiency argument as opposed to the instruction's argument, because it strikes me that McDonnell specifically says on the one hand, expressing support for something at a meeting is not enough to constitute an action, as long as the public official does not intend to exert pressure on another official or provide advice. Don't we have exactly that here, an intent to exert pressure? We don't, Judge Robertson, and here's why. Because what McDonnell is talking about there, the key word is another official, and I think in context what McDonnell is talking about is two officials who work for the same sovereign are joined by a chain of command such that the exercise of one person's office carries force as a matter of law or within the actual institution, and so I think another official there means somebody who's working for the same government, or in another context, perhaps an agent, because that's what Percoco talks about. It's not enough that somebody's working for a government that has the ability to make life very difficult for the government so Judge Robertson, I think the critical thing is in what way do they make life difficult? Is it because the person that they're trying to influence has a duty? They literally, by virtue of their job, they have a duty to listen to and consider the advice that's given, or a duty to give effect to the directive that's being given. So if it's just political, if it's just this person's very power comes from the fact that he holds office as the county executive of the county in which all of this is taking place, that's quite different than Margiotta, who was a private citizen, and whatever one thinks of what this court did in that case and why the Supreme Court eventually abrogated it, the Supreme Court noted that fact. That was critical to Percoco, and that was that these were people who were private citizens exercising their purported real apparent political clout to say we're not going to support you in the next election, as opposed to someone who has an official office with power over those people and their constituents in Oyster Bay. So Judge Lynch, I'd say a couple things in response to that. I think the Supreme Court in Skilling, the Supreme Court in McDonnell, and most recently in Percoco, has tried to draw clear lines, clear lines so that the Honest Services Fraud Statute isn't used to prohibit or to criminalize political activity. And one of the lines is this fiduciary duty requirement that we see like taking $100,000 not as a political campaign contribution, but as to one's private coffers in order to influence the activities of the governments within Nassau County. That's a line that we must not cross. That has to be legal. Yes, Your Honor, and here's why. Because once you cross that line, once you cast aside the requirement of official action, and that means authority and duty, and there's lots of ways you can have authority and duty, but you've got to have it. Once you cross that line, then courts will be left guessing, well, how much of this influence is because the person's in the same party? That's not a hypothetical risk. The government argued that here. It argued, and I'll quote, yes, the town of Oyster Bay is a different government, but it's a different government smack dab in the middle of Nassau County. And Venditto was a supervisor in the same political party. So you'll be guessing, how much of the influence was from the fact that the person was being part of the official fiduciary duty of the person who's been preserving it? Well, Your Honor, there's no evidence that Mr. Mangano had any official authority over the town of Oyster Bay. And in fact, it was undisputed in the trial court, the district court. The roads in the town of Oyster Bay? The county, yes? Yes, Your Honor. The police force operates in the town of Oyster Bay. The county police, right? Yes, Your Honor, but again, that doesn't say anything about Mr. Mangano's fiduciary relationship, and it doesn't say anything about his authority. His authority is specific to Nassau County. His fiduciary relationships are to Nassau County. They don't run through the town of Oyster Bay. And these clear lines the Supreme Court has made crystal clear have to be followed because otherwise you risk criminalizing too much political activity. And so we submit that there's the same problem, a very similar problem. Yes, Judge Lynch, and I do think it's important to note that it was really undisputed that Mr. Mangano was not an agent of the town of Oyster Bay. So it's not like there's evidence that he could have pulled this lever in Nassau County, and this would have happened by operation of his office or his official duties and responsibilities in the town of Oyster Bay. The government just elided the distinction between the two governments, and the district court's instructions permitted the government to do that. And we submit that under the Supreme Court's recent cases, that requires that Mr. Mangano's conviction be set aside. I understand you wanted to reverse them both, and so maybe this isn't a question you can answer fairly, but you've kind of lumped the honest service fraud with the federal bribery conviction into the same argument, and I understand conceptually that the same thing's happening. You have different statutes with different words and different requirements and different case law. Is it possible that you win on one of those and lose on the other? Anything's possible, but I will say that... It is logically possible. I think logically the key fact that carries weight with both statutes is that Mr. Mangano is not an official of the town of Oyster Bay, and he's not an agent of the town of Oyster Bay. So 666, the federal bribery statute, has the definition of agent, and so it hooks into that. Let me jump in, because I think what I'm getting at is whether the concept of a fiduciary relationship or fiduciary duty might be different from the concept of whether someone's an agent, and that that might cause a slightly different analysis of these two statutes, if that's what you're hanging it on, is the relationship to kind of Mr. Mangano. Certainly, Your Honor, doctrinally there is a distinction, as you point out. There's a statutory definition of agent in the federal bribery statute, and there isn't one in the honest services fraud statute, but I think the effect of Mr. Mangano not being an agent, not being an officer at all at the town of Oyster Bay, is the same for both, because Prococo, if you look at Prococo, the way that it thinks about a fiduciary relationship, it invokes agency law, and I think the court there was really responding to Justice Scalia's concurrence in Skilling, which expressed concern about the scope of a public official's fiduciary duty and just how unclear it was. So I do think when you consider the way that the Supreme Court thinks about the fiduciary relationship and duties in Prococo, and then the 666 definition of agency, you end up in the same place. Thank you, Your Honor. Good morning, Your Honor. It's Mo Fodeman for the appellant, Edward Mangano, as well. Thank you for the indulgence. I'll be very brief on the obstruction point. As you know, Mr. Mangano was also convicted of conspiring to obstruct a grand jury investigation based on allegedly false statements made by his wife, Linda Mangano, to prosecutors and case agents in a conference room at the U.S. Attorney's Office, and he's serving a 12-year sentence for this crime as we speak. Well, he's not really. I mean, this is an argument that goes to the sentencing issues as well, but under the sentencing guidelines regime, there's not really a specific sentence that attaches to one crime. You calculate the total sentence and then assign it to different crimes as necessary to get to a result. So if there were to be a reversal of the substantive corruption counts, surely there would be a total resentencing here. So I don't think you have to worry about the sentence for this case. Your Honor, you and I are on the exact same page here. We don't dispute any of that. Suffice it to say, he obviously was punished by that, and it's as you say. He's got a conviction for this, and it has to be a legal conviction, so you don't have to worry. Don't get into the rhetoric about the 12-year sentence, because that's not really the point. We're speaking the same language, Judge. I do want to address your point to Ms. Mangano's counsel, your question regarding whether it was proper for the juror to infer that there was here on the part of Ms. Mangano and the other co-conspirators that the statements would get to the grand jury, these allegedly false statements. And what I do want to stress is the Supreme Court's express language in Aguilar, which says, may or may not get there, knowledge that it may or may not get there, these false statements, is not sufficient. Straight out says that. Also says that the defendant's impression that these false statements would get to the grand jury, also not sufficient. Remember, in Aguilar, a federal judge was told by the agent that, yes, there is a grand jury, and yes, they're going to be hearing testimony on the very subject of the questions I'm asking you, so it cannot be enough. It simply cannot be enough that a defendant in his or her own mind thinks, hey, this stuff could probably get to the grand jury. Here, though, Your Honors, one thing I do want to say. What would be enough? Well, here we have exactly what we need in this case, because in this case, one of the co-conspirators testified. We have to credit his testimony. Mr. Singh testified. Sir, and I can quote, why were you agreeing with the Manganos to lie in the meeting? We have a window into what the object of the conspiracy is, because Mr. Singh answered that question of the prosecutors. The reason was, I wanted to get the story, because we were all going to tell the story to the FBI, certain things. And I was going to tell the FBI the story. And this Court's decision is for telling the FBI, telling the FBI in some ancillary proceeding is just not enough. We don't. But if it's not enough to receive a grand jury subpoena that speaks to your testimony before the grand jury, and then to, as my colleague suggested, to engage in a standard procedure of meeting with the FBI prosecutor, it almost sounds like you're saying you can't convict unless you have some Miranda warning. This evidence is intended for the grand jury. I'm saying a couple of things in response to your Honor. First, I'm saying, I'm not saying this is not potentially criminal activity. It certainly could be 371-1001. They conspired to lie to agents. No problem. These folks didn't decide to charge that for whatever reason. So we don't have to worry about criminality going astray here. We also don't have to worry about the notion that simply when you get a grand jury subpoena, that gives rise to some Miranda warnings. Because, again, in each of these cases, like Aguilar, they were told there is a grand jury proceeding. In Schwartz, they had received a grand jury subpoena from that very agent. And yet the officer in that case contacted the same agent and said, I'd like to talk to you, and then proceeded to lie with the hope, this was in the record, with the hope that that information would get to the grand jury. And that, this court said, was not sufficient. So under all, and then one last point, and you've indulged us too much already, Your Honor, but if I could just make one last point. Keep in mind the timing here. This is much different than either of those cases, because in Aguilar it was immediate, in Schwartz it was a few days later. In this case, the grand jury and the lies that are being concocted are in May. The grand jury was served in the first week of February. All this is happening on May 18th, 19th, 20th is when they're concocting their stories, the grand, she goes into the U.S. Attorney's Office on the 20th, and the 22nd. So again, it's even more extracted from the service of the subpoena. So again, I thank Your Honor for taking the time to listen. I think this one, we are fortunate that we have a Supreme Court case that tells us what to do in this situation, and a decision from this court. This one, I submit, Your Honor, is straightforward. Thank you. You're from the government. Good morning. My name is Katherine Mirabile. I'm an Assistant U.S. Attorney in the Eastern District of New York, counsel for our affilee. I'd also like to note that I have been assigned to this case throughout the investigation and prosecution, and I was part of the trial team for both trials in the district court. The judgments convicting Edward Mangano and Linda Mangano after a jury trial should be affirmed. If I could start, there's a number of issues to address, but since we just ended on the obstruction, if I could just pick up on the obstruction and respond to some of the comments that were quickly made. The obstruction, Mr. Fodeman had indicated, was only based on Linda Mangano's false statements. That's not true. They were also based on the meetings that took place in order to concoct the false statement. There were several meetings between Ed Mangano, Linda Mangano, and Harendra Singh after the service of the grand jury subpoena in order to concoct a false narrative to them. Mr. Fodeman pointed out those meetings spoke explicitly, according to Mr. Singh, of making false statements to the FBI. Whether it's the statements that are made in the interview or the meetings that were held, the issue remains consistent for all of them. What is the evidence that the defendants understood that these statements were destined for the grand jury? The meetings occurred after the service of the grand jury, which is for Linda Mangano's testimony, and the meetings took place in conjunction with coming into proffer, took place back in February after the service of the grand jury subpoena. Almost immediately, I think it happened the next day. And then also before and after Linda Mangano came into proffer on May 18th and 19th, she came in and proffered on the 20th, and then they also met again. When you say proffer, this has meaning to people in the trade, but has potentially different meanings, right? Proffers are made in contemplation of possible cooperation, for example, and there are standard form agreements that are used with respect to proffers. Was there any written agreement with respect to this particular conversation? There was a proffer agreement for Linda Mangano's proffers with the government. And was this a standard, what used to be called in the sexist way, a queen for a day? Yes, yes, your honor. And the only thing in that, though, that at least as I remember them from the many years ago that I used to do this on both sides of the aisle, I don't remember any provision in there saying that, by the way, this is in connection with a grand jury investigation that you are speaking to us. I take it there was not such a statement in the written agreement? That is not specifically in the agreement, but Linda Mangano was advised at the beginning of the proffer agreement that it was a crime to lie to federal officials. She was specifically advised of that before the proffers began. Well, that goes to the 1001 counts, but as far as the obstruction of a grand jury proceeding, it might be a useful thing to throw into the written agreement that this is in lieu of, or potentially in lieu of, or is intended by the speaker to substitute for grand jury testimony. That's perhaps how I might have understood the situation as a defense lawyer, but that's not said anywhere. Your Honor, the grand jury subpoena, which was introduced in evidence as government exhibit 316, was issued by myself, who was also present at the grand jury. It was served by Special Agent Spence, who was an arm of the grand jury, also present at the proffers, and Linda Mangano knew that testimonial grand jury subpoena called for her testimony related to her employment with horrendous thing and what her duties were, and in order to explain what she did as employed by horrendous thing, that information is something that's in testimonial in nature that has to be reported back to the grand jury. The grand jury specifically requested her information with respect to what she did as her job. Is that different than Schwartz? Is that different than Aguilar? It is. Neither Schwartz or in Aguilar were the defendants served with a testimonial grand jury subpoena, and the information, as I said, that was requested is something that would be orally responded to, their duties and responsibilities. In addition, in Schwartz, Bruder asked to come in. He initiated the meeting with the federal investigators. In this case, the federal, the U.S. Attorney's Office initiated the meeting by serving the grand jury subpoena on Linda Mangano to ask for her to come in. There was also testimony from Len Genova at trial that reported that horrendous thing's attorney told him that Linda Mangano had received a grand jury subpoena for her testimony to the grand jury, and in response, she went in and proffered with the government in response to receiving that grand jury subpoena. The jury also heard that. There's certainly overwhelming evidence that Linda Mangano knew that she was coming in to speak to prosecutors and agents in response to a grand jury subpoena, and that she met with the government, the prosecutors, in response to the grand jury subpoena. And as I mentioned, the nature of the inquiry is certainly reasonable that that would be relayed to the grand jury. So turning to the fighting sherry duty, the honest services fraud, and the federal program bribery claims, there's nothing in McDonald's that indicates or that states that an official has to be within, in order to pressure another official, has to be within the same government. Here, the town of Worcester Bay is wholly subsumed within Nassau County. There's no citizen of the town of Worcester Bay that is not also a citizen of Nassau County. And the evidence overwhelmingly showed that Ed Mangano used his position as the Nassau County executive to exert influence and to pressure town of Worcester Bay officials to take action on the concession amendment. And we know that he was acting as Nassau County executive at the time for a number of reasons. First, Herenderson testified that he went to Ed Mangano in his capacity as the county executive. But also, every single person that recalled Ed Mangano being at the meeting stated that he was at the meeting in his capacity as the county executive. Len Genova testified that he was there as the county executive. Jonathan Sinright testified that they were all surprised that the county executive would be at a meeting where no county business was being conducted. But yet, he was there as the county executive. In fact, at the meeting, Ed Mangano said, in sum and substance, as testified by both Len Genova and Jonathan Sinright, let's see what we can do to help our friends. We, the officials between Nassau County and the town of Worcester Bay. He was also driven there by his official detail. And the meeting shows up on his official calendar, which is in government exhibit 400A. So there's no indication that he's there as a friend or as a lobbyist. He is there in his official capacity as the Nassau County executive in order to change the decision to turn the ship around and have the town of indirectly guarantee horrendous things. Mr. Rowley suggested that the government told the trial jury that he was there to exercise political clout, which could be the same thing that would be said if it was someone in the position of the late Mr. Margiotto. The government argued, while the government used the phrase political clout, the government consistently argued it was in his capacity as county executive. It's not as a party boss or a private citizen or a lobbyist or an influential, even if not a party boss, influential member of another party. But he was there in his capacity as the county executive. And the government repeatedly argued that to the jury. And in fact, as set forth in the government's papers, he even himself took action as the county executive. He, at the request of John Venditto at that meeting, John Venditto asked him to hire and promote members of his Republican Party within the Nassau County government. And Ed Mangano did that. At the very beginning of your presentation on this issue, you said there's no law that says you have to be in the same entity as you're seeking influence. And this is why I'm struggling a little bit with lumping together the bribery and the amount of services. I understood our holding in Dawkins to say that to be convicted of federal program bribery as a principle, the entity for which the defendant is an agent must be the entity being influenced. Am I misunderstanding our holding in that case? No, I don't believe you're misunderstanding the holding in that case. But I do believe, I'm sorry. Well, no, so I'd like to understand, there's a lot of back and forth in the record about whether the government's theory is that Mr. Mangano was convicted or subject to conviction on that theory as a principle or as aiding and abetting of both. And so I guess I would like some clarity because from your brief, I got the sense you were arguing principle, but from the transcript in the hearing, I thought you conceded that that wasn't on the table. We're arguing both. And we're talking specifically about the federal program bribery. Yes, that counts. Right. We're arguing both. As a principle, as an agent for Nassau County, he was directly liable for the town of Oyster Bay scheme because, as I mentioned at that April 28th meeting, he pressured John Venditto. When he pressured John Venditto, John Venditto asked him to hire individuals within Nassau County to promote individuals. So the bribery scheme was not the one that was then charged. It was the bribery as between Venditto and... Well, we've always argued that it was somewhat circular. So he was bribed by Harinder Singh to influence the town of Oyster Bay. And in doing so, in doing that, as part of that, John Venditto also asked for Ed Mangano to do things for him. It's all connected. Is there any evidence that Singh asked Mangano to engage in that exchange with the county supervisor? No. Harinder Singh was present when the ask was made, but Harinder Singh, there was no testimony that he was involved in... that he specifically asked or endorsed that or asked him to do that. But it's certainly foreseeable for Ed Mangano when he is asking a political favor, or not a political favor, he's asking for a favor of the town government for his personal benefit that John Venditto would then turn around and ask for an action, an official action by Ed Mangano. Okay. So the federal bribery is in his capacity as an agent of Nassau County? Yes. That's the theories of principle? That's the theory of principle. And then we also argued the aiding and abetting. Well, what is the aid and abet? I mean, I understand that the government's theory at the very outset of all of this was that Venditto also was on the tape. Of course, he got acquitted of that. And there's also not any evidence that Mangano, if I'm aware of, you can correct me if I'm wrong, that Mangano knew that Singh had also bribed Venditto. You are not wrong on that. Okay. I thought you were going to tell me that was not right. It makes it easier for you, but it makes it for getting straight forward. There's no dispute that Harinder Singh bribed the town of Oyster Bay officials. And we argued that to the jury at the second trial as well. What Mangano disputes is his knowledge of those bribes. But there's ample proof in the record that would allow a reasonable juror to infer that he was aware of Harinder Singh's bribes to town of Oyster Bay officials, or that they were reasonably foreseeable to him. I don't know what exactly aiding and abetting, but I'm having trouble understanding why it for someone who has a fiduciary responsibility with respect to how he exercises his power as county executive, which encompasses power over the town of Oyster Bay and the citizens thereof, exercises that power for his own private gain in order to persuade the town supervisor to equally do something that is directly in violation of his responsibility to his constituents. And that, in fact, is at best got a fig leaf on it to keep it from being a violation of the New York Constitution, and then eventually evolved into something where the fig leaf is removed in terms of offering direct guarantees for the loans for private individual. So what do you call that, if that's your theory? Is that being a principle or being an accessory, or is it being someone who manipulates someone else, or thinks he's manipulating someone else, who's, as it turns out, is also being bribed by the same person? But I would say that that would be as a principle, and we did argue that in our papers that by alleging that he was an agent of Nassau County, that necessarily included the subdivisions, the governments within Nassau County. So that would be under principle liability. So when there was this exchange about the jury instruction, and there was the objection where the defense wanted to make it clear that if you were going to do, if you were going to convict on the basis of the talent of Mr. Bay, you had to sort of follow this aiding and abetting theory, and the government objected. And I think the consensus of that exchange, and the court said, it's clear in the charge. I don't think the charge suggests that Mr. Bay is found guilty as a principle. This is with respect to the talent of Mr. Bay, which follows immediately on the government saying, I think it's clear. Nobody says, oh, actually, your honor, we do think he can be found guilty as a principle. Here's our perhaps complicated, but multi-step theory to get there. Is that some sort of waiver, or is that the government law has kind of changed its position on that after the jury's instructed? I'm trying to figure out what to do with that exchange. Sure. We argued that he was a principle, and we also argued that he was an aider and abetter. So there was no waiver, because we consistently did argue that he was a principle. We said that he wasn't specifically an agent of the talent of Oyster Bay, but by saying that, we never waived our argument that he was acting in a principle capacity. So the court, where the court said, I don't think he can be found guilty as a principle relative to the Oyster Bay scheme or situation. But the court also found that he did it. He was liable as a principle in the district court's post-trial decision. The court did find that he was liable as a principle. So as I had said, that there's nothing in the case law that indicates that an official has to be acting within the, the official doesn't have to be within the same with respect to the specific question or matter. I can certainly go through that if your honors wants to have a discussion with respect to that, or in particular with respect to the advice instruction or their objections. You don't address the conspiracy as to federal programs by bribing in your brief, I don't think. Do you have any, could you explain to me what exactly the federal program statute, what the conspiracy was? The conspiracy to federal programs bribery. Right. The conspiracy between horrendous things. And then also there's a conspiracy that involves the town of Oyster Bay officials who are the agents that actually took the official action. And horrendous things, bribes, as I, as I have mentioned, horrendous things, bribes at Mangano in order to influence those town of Oyster Bay officials. And the town of Oyster Bay officials themselves were accepting bribes from horrendous things in order to indirectly guarantee the loan. So are those three different conspiracies or? All one conspiracy. The object of that conspiracy is to get financial backing for horrendous things loans and for the town of Oyster Bay to guarantee that. And to bypass the New York state constitution in doing so. Okay. If the court has any specific questions with respect to the as opportunities arise or the advice or any of the other issues, I'm happy to address them. Well, there's one thing that would be helpful. Could you marshal the proof as to what evidence the trial establishes that Mr. Mangano, at the time he accepted the bribe, understood that this was about a series of transactions involving loans as opposed to a one-shot deal? Sure. There was overwhelming evidence that he knew that the bribes were in exchange for horrendous things, horrendous things loans in order to make capital improvements and for the that they were multi-million dollar loans at multiple locations. There was, aside from the testimony of horrendous things, we have the testimony of Bill Savino from Rivkin Rattler, who had a 12-minute phone conversation with Ed Mangano, where Ed Mangano knew the details, very key specific details, and relayed that horrendous things needed loans for multiple locations in the multi-million dollars, that the town was to be guaranteed but to find a way around the New York state constitution. So we have testimony from Bill Savino that it was for multiple locations for multi-million dollars. We also have the testimony about that April 28th meeting. There was discussion about the need for capital improvements at both locations, the Woodlands and Tobay Beach concessions, and that in order to make those capital improvements, in order for Singh to get the finances, it was in the millions, multi-million dollars, and that it was for multiple locations. The main point is, isn't it, that there was an agreement that the town of Woodlands and Tobay Beach would do what was necessary to help Singh out with his loans? There was no number placed on, did they ever say in that meeting that, according to the testimony, that here's the exact loans that we're talking about, here's the exact numbers on these? There was no discussion that there was a set number that had to be a set amount other than right. Correct. Unless the court has any other questions. Thank you. Thank you, your honors. I will be brief. I want to revisit the obstruction count again. Counsel for the government said it's obvious that Ms. Mangano knew that her information to the agents would be relayed to the grand jury. I think there's the record in this case reflects just the opposite. In support of that contention, counsel argues or points to the meeting with Singh, but as my co-counsel read the transcript of Mr. Singh's testimony, there was no mention of the grand jury. He specifically, Mr. Singh, testified that they wanted to get their story straight with respect to Ms. Mangano going in to talk to the government. Mr. Singh had not received a grand jury subpoena. Counsel for the government declares that Agent Spence was an arm of the government. There's no evidence in the record to show that Ms. Mangano was aware of that. The fact that Agent Spence served Ms. Mangano with a grand jury subpoena I submit is of no import because that's exactly what occurred in the Schwartz case. Not only did the case agent in the Schwartz case serve the defendant with a grand jury subpoena, but the subpoena was signed by Assistant U.S. Attorney Ken Thompson, who sat in at the proffer. This court, nonetheless, said there was not sufficient evidence to know the defendant in that case was aware that whatever information was relayed would end up in the grand jury. As I indicated before, and I will continue to reiterate, that the government makes a distinction somehow that the subpoena in the was issued a subpoena to give testimony. I submit that that bolsters our case because Ms. Mangano fully expected, based on the subpoena, that she was going to go into the grand jury and have to give direct testimony. So knowing that, it is really remote to speculate that she was on notice that somehow some vague summaries that were put together a couple days after her testimony would somehow be provided to the grand jury. In Ms. Mangano's mind, why would they need that when they're going to hear it directly out of her own mouth? So I submit that Aguilar and Schwartz are directly on point and the obstruction count, as well as the false statements counts, should be reversed. Thank you. I'd like to respond to a question that Judge Robinson asked and then quickly get to Judge Lynch's questions to the government as well. So the government has argued, we saw this in their answering brief and we just heard this now, that the action that Mr. Mangano took within several problems with this theory, most important of which it's uncharged. I mean, it's just the alleged bribe is not that Mr. Singh would give Ms. Mangano a job in exchange for hiring and firing people as a fulcrum or some kind of lever to get the town of Oyster Bay to take action. That's not the charged crime and this matters a lot because of McDonald. Isn't that exactly what I was talking about earlier and asking you questions about the power that the county executive can exert? Mr. Venditto asks for him to do things as county executive because, of course, he's aware that he had to get the things that he needs from the county executive. He needs to please the county executive, Quay County Executive. But Judge Lynch, that's why McDonald focuses so much on what the what McDonald teaches is it's got to be what you have to have as a bribe in exchange for a specific and concrete or what I think the court says is focused and concrete action. What's the action in here? The charged action is an action in another government. It can't just be the case that because there's political log rolling, I mean, there's that Judge Easterbrook. There's a bribe being paid in order to get the county executive to exert his influence on the state. That's not about a bribe to get him to hire Venditto's cronies. Hiring Venditto's cronies is the evidence that tells us that what is happening here is the exertion of the authority of the county executive. That the county executive is leaning on Venditto and this is just one example of the kind of thing that's going to happen. That's not going to happen for the town and its supervisor if Venditto doesn't do what he's asked to do. Judge Lynch, I come back to the requirements of McDonald. What McDonald says is that the official has to take action on the subject or question. It can't, it has to be, the officer has to have the ability, has to have the authority and the power to take action on the matter. To make it happen. Your honor, again, I think that those two governments are being collapsed in that situation and I think if you look at Birdsall, what the court talks about is authority and it talks about duty. That's why the court in Birdsall talked about that fact, that those were the facts there. But your honor, here, just think about the meeting that the government referenced in its presentation. What the government wasn't able to say was that Mr. Mangano had authority over the concession amendments and what the government wasn't able to say was that Mr. Venditto had the duty to carry out that advice or had the duty to give effect to his influence because that's simply present and this does raise your honor's question about fiduciary obligations. If you think about what it would be like if an official had fiduciary duties, not just to their constituents, the people they serve, in their own actions within the scope of their duties, but that their fiduciary obligations ran to any government within their geographic jurisdiction, those duties would be completely indeterminate. They couldn't even decide or figure out how they discharged their duties because they could be conflicting. State and local governments often have conflicting interests. So it can't be that the fiduciary duty runs not just through the government they actually serve, but through governments that happen to be within geographic boundaries. And there is, in this respect, an arbitrariness to the government's theory because if it's true that Mr. Mangano engaged in honor services fraud because he took money and did something that really wasn't in the service of Nassau County, that would be equally true if the town that he was in was in Nassau County. If it was in another state, the same thing would be true. And so you have to look at Skilling. Skilling says this generalized theory of honor services fraud raises vagueness problems and makes the statute too broad. It covers too much. I'm always a few seconds late because I have to think about the hypothetical. In the scenario using the influence of the other state, I suppose you can have a scenario where he uses his authority as an executive of Nassau County to influence somebody in another state. We'll give you this contract. Yes. Are you saying that that would be somehow an odd result of that? Yeah, I think your honor, in that situation, if I understand your hypothetical correctly, there would actually be the exercise of authority because there would be some kind of contract. There would be obligations that were established on the part of the person getting the influence, right? So that's a very different situation here because there's just no dispute that Mr. Mangano had no authority over the concession amendment approvals. I did want to make sure I got to one other question about that your honor was asking about aiding and abetting because the government has sort of bobbed and weaved on this theory. I think the passage that Judge Robinson, that you the government and the court establishes that the government waived its principle liability theory. I mean the court asked the prosecutor whether it was just aiding abetting and Pinkerton and they said yes. So I mean I think that that theory is waived and it's gone. What about the argument that what was really going on in the room was agreeing there's no principle liability as to that relies on him being principal of town of Worcester Bay, but that doesn't allow principle liability that runs through Nassau County in some way? Well then you run headlong into the problem I identified with this hiring and firing theory, which is that it's uncharged and it's not a quo that was actually in the indictment and McDonald says that matters. You have to have a specific and concrete official exercise of government power and that was not charged. But I do think quickly this aiding and abetting theory also uncharged, right? The initial indictment in this case alleged a bribery of Venditto, that that Singh bribed Venditto, but Mr. Venditto was acquitted, the jury hung up to Mr. Mangano and that charges in the superseding indictment. So again I think that there's a sufficiency problem as to the aiding and abetting theory because the theory that's actually in the indictment would require that Mr. Mangano aided abetted somebody else in order to benefit himself and there's just no evidence to support that here. There's no further questions. Thank you all. We'll take the matter under advisement.